IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No. ___3:09cv438___

FILED
CHARLOTTE, NC

OCT 0 9 2009

U.S. DISTRICT COURT
WESTERN DISTRICT OF NC

UNITED STATES OF AMERICA *ex rel.* )
JOHN DICKSON, )
           )
           Plaintiff, )
           )
           )
v. )
           )
           ) **COMPLAINT: FILED UNDER SEAL**
TOYO INK MANUFACTURING CO., LTD.; ) **PURSUANT TO 31 U.S.C. § 3730(b)(2)**
TOYO INK INTERNATIONAL )
CORPORATION; TOYO INK AMERICA, )
LLC; TOYO INK MFG. AMERICA, LLC; )
and PYOSA, S.A. DE C.V. )
           )
           Defendants. )

The United States of America *ex rel.* John Dickson ("Relator"), complaining of Toyo Ink

Manufacturing Co., Ltd. ("Toyo Ink"); Toyo Ink International Corporation ("Toyo

International"); Toyo Ink America, LLC ("Toyo America"); Toyo Ink Mfg. America, LLC

("Toyo Mfg. America") (collectively "Toyo"), and Pyosa, S.A. de C.V. ("Pyosa"), (collectively

"Defendants"), alleges and says as follows:

## I. PARTIES, JURISDICTION, AND VENUE

1.     Relator is a citizen and resident of Mecklenburg County, North Carolina, is over

eighteen (18) years of age, is not under any legal or other disability, and is the original source of

the allegations delineated herein, which he bases upon his own personal knowledge,

investigation, and observation.

2.     Upon information and belief, Toyo Ink is a corporation organized and existing

under the laws of Japan. Upon further information and belief, Toyo Ink transacts substantial

business worldwide, including this federal judicial district.

3.     Toyo International is a corporation organized and existing under the laws of the State of Delaware.   Upon information and belief, Toyo International transacts substantial business in the United States, including this federal judicial district.

4.     Toyo America is a limited liability company organized and existing under the laws of the State of Delaware.  Upon information and belief, Toyo America transacts substantial business in the United States, including this federal judicial district.

5.     Toyo Mfg. America is a limited liability company organized and existing under the laws of the State of Delaware.  Upon information and belief, Toyo Mfg. America transacts substantial business in the United States, including this federal judicial district.

6.     Upon information and belief, Toyo International, Toyo America, and Toyo Mfg. America are subsidiaries of Toyo Ink, and all are subject to common control.

7.     Upon information and belief, Pyosa is a corporation organized and existing under the laws of Mexico and maintains its principal place of business in Mexico.   Upon further information and belief, Pyosa conducts substantial business in Mexico and the United States.

8.     This Court has original federal question jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3730(b).

9.     Venue is proper here pursuant to 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732(a) because at least one of the Defendants transacts business in this federal judicial district.

## II. FACTS

### The Product At Issue

10.     Carbazole violet pigment 23 ("CVP-23") is a type of synthetic organic chemical extant in both crude and finished forms ("Crude Violet" and "Finished Violet", respectively).

11.    Finished Violet is used to color inks, textiles, plastics, coatings, and other materials, while Crude Violet has no use or purpose other than to produce Finished Violet.

12.    There are five separate chemical reactions required to synthesize Crude Violet.

13.    The reactions use several dedicated vessels, each designed and built for the specific reaction and operations performed.

14.    In addition to the reaction chemistry, there are several chemical unit operations required to produce Crude Violet, including washing, purification, filtering, solvent recovery, waste water treatment, and drying.

15.    Support facilities include steam production, cooling water, vacuum service, waste water treatment, environmental venting, and capability for safe handling of hazardous chemicals used to product the pigment.

16.    By contrast, Crude Violet is converted into Finished Violet in a particle size-reduction process that does not involve any chemical reaction, just grinding, washing, filtration, and drying.

17.    Grinding is required to reduce the particle size to less than one micron, thus greatly increasing the strength of the pigment.

18.    The equipment necessary to produce Finished Violet is not dedicated as in the case the requisite equipment for Crude Violet, but is instead also used to finish other colors, such as blue and green.

19.    The finished pigment is available in two forms – "presscake" and "dry color." Presscake is the ground and water-washed product dropped from the "filter press."

20.    Dry color is made by drying the presscake, and dry color form of CVP-23 is most widely used in the industry.

21.     In sum, Crude Violet and Finished Violet share not only the same molecular formula ($C_{34}H_{22}Cl_2N_4O_2$), but also the same Color Index Number ("CI No.") (51319); the same Chemical Abstract Services Number ("CAS No.") (6358-30-1); the same chemical name (diindolo [3, 2-b: 3', 2'-m] triphenodioxazine, 8, 18-dichloro-5, 15-diethyl-5, 15-dihyrdro-); and the same classification under the Harmonized Tariff Schedule of the United States ("HTSUS") (subheading 3204.17.90.40).[1]

**Market Background**

22.     Relator is the Chairman of the Board of Directors and Chief Executive Officer of Nation Ford Chemical Co. ("Nation Ford").

23.     Nation Ford is a corporation organized and existing under the laws of the State of South Carolina, which maintains its principal place of business in York County, South Carolina.

24.     Nation Ford is the only producer of Crude Violet in the United States, but it does not produce any Finished Violet.

25.     Sun Chemical Corporation ("Sun") is a corporation organized and existing under the laws of the State of Delaware, which maintains its principal place of business in Morris County, New Jersey.

26.     Nation Ford supplies all of the Crude Violet it produces to Sun – pursuant to a long-term tolling agreement – from which Sun produces Finished Violet for distribution.

27.     In November 2003, Nation Ford and Sun jointly petitioned the United States Department of Commerce ("Commerce Department") and the United States International Trade Commission ("Trade Commission") under the Tariff Act of 1930 to investigate (a) whether

---

[1] Crude Violet and Finished Violet have shared the same HTSUS classification since the North American Free Trade Agreement ("NAFTA") became effective January 1, 1994, prior to which time they were classified under HTSUS subheadings 3204.17.50.90 and 3204.17.50.40, respectively. See, e.g., CBP NY871820 (March 10, 1992); CBP NY883083 (Feb. 26, 1993).

CVP-23 originating from India was being subsidized by the Indian government, imported into the United States, and sold here at less than fair value ("LFTV"); and (b) whether CVP-23 originating from the People's Republic of China ("China") was being imported into the United States and sold here at LTFV.[2]

28.    After conducting their investigation, the Commerce Department determined that (a) CVP-23 originating from India was being subsidized by the Indian government, imported into the United States, and sold here at LTFV; and (b) CVP-23 originating from China was being imported into the United States and sold here at LTFV.[3]

29.    The Commerce Department thus imposed the following additional customs duties: (a) A generally-applicable antidumping/countervailing duty of 44.80% on imports of CVP-23 originating from India, and (b) A generally-applicable antidumping duty of 241.32% on imports of CVP-23 originating from China.[4]

30.    Accordingly, CVP-23 originating from those countries and being imported into the United States – whether in crude or finished form – is subject to customs duties in addition to the duty already owing under the HTSUS at the Most Favored Nations ("MFN") rate of 6.5%.

31.    The United States Customs and Border Protection division of the Department of Homeland Security ("Customs Department") is responsible for assessing all customs duties.

---

[2] See, e.g., 68 Fed. Reg. 66,851 (Nov. 28, 2003); 68 Fed. Reg. 70,761 (Dec. 19, 2003).

[3] See, e.g., 69 Fed. Reg. 67,304 (Nov. 17, 2004); 69 Fed. Reg. 67,306 (Nov. 17, 2004); 69 Fed. Reg. 67,321 (Nov. 17, 2004); 69 Fed. Reg. 68,876 (Nov. 26, 2004); 69 Fed. Reg. 77,776 (Dec. 28, 2004); Carbazole Violet Pigment 23 from China and India: Investigation Nos. 701-TA-437 and 731-TA-1060 and 1061 (Final), USITC Pub. No. 3744 (Dec. 2004) [hereinafter "CVP-23 Investigative Report").

[4] See, e.g., 69 Fed. Reg. 77,987 (Dec. 29, 2004) (issuing antidumping duty order regarding Chinese CVP-23); 69 Fed. Reg. 77,988 (Dec. 29, 2004) (issuing antidumping duty order regarding Indian CVP-23); 69 Fed. Reg. 77,995 (Dec. 29, 2004) (issuing countervailing duty order regarding Indian CVP-23); 72 Fed. Reg. 15,101 (March 30, 2007) (revising antidumping duty rates regarding Chinese CVP-23).

32.     In doing so, the Customs Department necessarily relies upon the country-of-origin information that must be reflected on (a) the CBP Form 7501 accompanying every import into the United States intended for domestic consumption;[5] (b) the CBP Form 434 accompanying every import into the United States from a country covered by NAFTA;[6] and (c) markings on the product itself.

33.     As detailed herein, Toyo Ink, Toyo International, Toyo America, and Toyo Mfg. America, along with Pyosa, have wrongfully avoided paying tens of millions of dollars in customs duties and attendant penalties by knowingly making, or causing to be made, materially false country-of-origin designations on the CBP Form 7501, the CBP Form 434, and/or the packaging for imports of CVP-23 originating from China.

## Product Classification Issues

34.     The Trade Commission has defined the domestic industry for CVP-23 to include all domestic producers of Crude Violet and Finished Violet, currently comprised of Nation Ford, Sun, and Clariant Corporation ("Clariant").[7]

35.     Clariant's role in the domestic industry comes from finishing small amounts of Crude Violet produced in Germany and imported into the United States. Although Clariant is a small part of the domestic industry, it is a major supplier of Finished Violet to the United States market, sourced from Clariant in Germany.

36.     Toyo America also is a major importer of Finished Violet into the United States market, sourced from Toyo Ink in Japan.

---

[5] One blank exemplar copy of the CBP Form 7501 is included herewith as **Exhibit 1**.

[6] One blank exemplar copy of the CBP Form 434 is included herewith as **Exhibit 2**.

[7] See CVP-23 Investigative Report, ITC Pub. No. 3744 at 8. When the Trade Commission made its determination, there were two other small domestic producers of Finished Violet – Barker Industries and Allegheny Color Corp. – both of which ceased operations shortly thereafter.

37.     All organic pigments, including CVP-23, fall under HTSUS heading 3204.17 – "Pigments and preparations based thereon." This is the classification that NAFTA uses for establishing country-of-origin. See **Exhibit 3**, <u>NAFTA Annex 401, Specific Rules of Origin</u>.

38.     Possibly at issue in this case is the wrongful classification of Crude Violet under HTSUS Chapter 29 – Organic Chemicals.

39.     Specifically, companies exporting Crude Violet from China have used HTSUS heading 2934.9990, "Other Heterocyclic Compounds," to classify CVP-23. If Toyo simply uses such Chinese export classification as the Japanese import classification, Toyo would be creating the ruse that there was a classification shift when exporting Finished Violet under HTSUS subheading 3204.17.90.40, for a *bona fide* shift often is used to establish country-of-origin, as is the case with the NAFTA rules of origin.

40.     HTSUS Chapter 29, however, is designed to include virtually all organic chemicals known to man. Since most pigments are organic chemicals – such as CVP-23 – it is possible to find an appropriate basket category that fits the pigment.

41.     But the correct classification for both Crude Violet and Finished Violet is HTSUS heading 3204.17, "Pigments and preparations based thereon."

42.     Within this classification, the pigments are further identified by CI No. and CAS No.

43.     There can be no more specific identification of any pigment than its chemical formula and structure, as provided in the CI No. and the CAS No.

44.     HTSUS rules require that "the most specific description shall be preferred to a more general description."[8]

---

[8] See <u>Harmonized Tariff Schedule of the United States (2009)</u> – Supp. 1, Rule 3(a).

45. HTSUS subheading 3204.17.90.40 provides "the most specific description" of CVP-23 because it includes the actual chemical formula for the pigment.

46. There is no reasonable argument that a large basket category such as HTSUS heading 2934.9990 provides a specific description. But even if the descriptions were equal, the goods "shall be classified under the heading which occurs last in numerical order among those which equally merit consideration."[9]

### Further Background

47. Toyo Ink and Dainippon Ink ("DIC") in Japan, as well as Sun (owned by DIC) domestically, are large ink suppliers to the global market.

48. Those three companies have divisions that supply pigments to color the ink they produce and to sell to the commercial pigment market. The actual chemicals that constitute the pigments are often produced by separate chemical companies in the form of "crude" pigments, and thereafter finished by the pigment divisions of the ink producers.

49. Sumitomo Chemical ("Sumitomo") – the only Japanese producer of Crude Violet – ceased production in early 2006 because of announced environmental problems.

50. Sumitomo also had been losing market share to new production of low priced Crude Violet from China.

51. DIC had purchased part interest in Nantong Haidi ("Haidi"), a Chinese producer of Crude Violet and Finished Violet, and also began finishing pigment in China.

52. Toyo Ink formed a joint venture ("JV") with Pyosa, a Mexican pigment producer, as shown in the attached article from *Chemical Week*. See **Exhibit 4**.

53. Pyosa and the JV sourced Crude Violet from both China and Sumitomo.

---

[9] Id., Rule 3(c).

54.     Sun reduced the amount of Crude Violet purchased from Sumitomo and replaced it with Crude Violet produced by Haidi.

55.     Between 2001 and 2005, Chinese production of Crude Violet became well established with three major suppliers: Haidi, Nantong Longteng, and Hangzhou Multicolor.

56.     After the Sumitomo closure, both DIC and Toyo Ink were forced to source their entire Crude Violet requirement from China.

57.     Sun, in turn, sourced Crude Violet from companies in China (Haidi), Germany (Clariant), and the United States (Nation Ford).

58.     As mentioned above, Sun, Clariant, and Toyo have been the traditional suppliers of Finished Violet to the United States.

59.     Imports from the JV in Mexico appeared in 2001, but ended abruptly in 2007.

60.     During the period that the JV was active, there were no imports from Japan, but imports resumed again in 2007 and have grown substantially since that time.

61.     Import data by HTSUS Classification Number is readily available from the Trade Commission's Dataweb.[10]     **Table I** included herewith shows all CVP-23 imported into the United States from Japan and Mexico for the period 2000 through June 2009.[11] Since the HTSUS Classification Number includes all forms of CVP-23, the import data does not distinguish between Crude Violet and Finished Violet.

62.     The imports from Japan include both Crude Violet – all supplied to Sun – and Finished Violet supplied to Toyo America.  The imports from Mexico are all Finished Violet

---

[10] The Trade Commission offers this online service, with the data organized primarily by the U.S. Harmonized Tariff System using information provided by the United States Census Bureau. The original source of the data is from each CBP entry made into the United States.

[11] **Table I** and **Table II** each have three parts: **Part A** reflects customs values, **Part B** reflects import quantities in kg, and **Part C** reflects unit values in $/kg.

supplied to Toyo America. <u>See</u> **Exhibit 5**, a sample report from Mexican Customs for July 2004 showing Pyosa as exporter and Toyo America as importer.[12]

63.     Since Sun is the only domestic importer of Crude Violet from Japan, while Toyo is the only significant importer of Finished Violet from Japan, a good estimate of Toyo imports can be made by simply subtracting the imports of Crude Violet.

64.     Sun has imported Crude Violet mostly through the Cleveland District, except in 2003 and 2004, when some imports were made through Chicago.

65.     Crude Violet also came through Charleston in 2000 through 2004, to supply what is now Sun's pigment plant in that city.

66.     Finished Violet imports are estimated by simply deleting all imports to Cleveland, Chicago, and Charleston for the applicable time periods. There also were *de minimis* imports through Alaska and Los Angeles that have been deleted because of abnormally high or low unit values.[13]  **Table II, Part A** is the same as **Table I, Part A**, except for the deletions just mentioned.[14]  **Table II** provides a good estimate of the imports actually made by Toyo America. **Table II** also illustrates the antidumping and MFN duties that have been lost, and penalties that should be applied, to be discussed later herein.

---

[12] There is no evidence that the JV actually operated as a separate entity.  As will be shown later, beginning in 2004, Pyosa was the importer of record for Crude Violet from Japan and China, but the pigment was ordered and paid for by Toyo.  Also, beginning in 2004, exports of Finished Violet were made by Pyosa to Toyo America.  It is not known if the exports prior to 2004 were made on behalf of the JV or were simply Pyosa sales to unrelated customers in the United States.

[13] Abnormal prices may be caused by misclassifications or other errors when the data is entered by CBP.  It also is possible that the prices are for different forms of pigment not covered by an antidumping or countervailing duty order.

[14] Crude and abnormally valued imports are color-coded green and red, respectively, in all parts of **Table I**.  Likewise, the deleted cells in **Table II** are so color-coded with an "x."

67.     Documentation is also available from import data firms that subscribe to the Custom Department's Automated Manifest System ("AMS"), the most prominent being PIERS and Zepol.[15]  These records are in the form of ocean bills of lading ("B/L's") describing all products entering ocean ports of the United States.

68.     One of the most effective ways to search the B/L's is by unique product trade name. Toyo's trade name for Finished Violet is Lionogen Violet.[16]

69.     The B/L's resulting from a search of both PIERS and Zepol using such trade name for Toyo's imports from 2000 through September 2009 are included herewith collectively as **Exhibit 6** and incorporated herein by reference.  The B/L's for Sun imports of CVP-23 from Sumitomo are included herewith collectively as **Exhibit 7** and incorporated herein by reference.

70.     These B/L's provide specific information that can be used to reveal the actual importer and exporter, but do not provide a perfect match with the Dataweb.  They do not include the Custom Department's values, and the quantities reported are the total "vessel" weight of the entry, while the Trade Commission reports net weight of the imports for domestic consumption.

71.     Net weight is without packaging, while vessel weight is with packaging.

72.     Toyo has both exported and imported under its own name, but has also used international freight companies such as Mitsubishi, with Lionogen Violet trade name surfacing throughout both Toyo's and Mitsubishi's B/L's.

---

[15] PIERS has provided this service for many years, in the form of paid subscription for specified data.  Beginning in 2003, a new company, Zepol, also became a subscriber to the AMS linked with online software allowing access to all AMS data for a single yearly price.  Nation Ford used PIERS before 2003 and Zepol thereafter.

[16] The Toyo trade of Lionogen Violet can be confirmed at the following webpage: http://www.toyoink.com/products.cfm/color_and_media_materials/organic_pigments/pigments_f or_inks.

73.     There are periods when the shipping companies do not include trade names, as was the case for most of Toyo imports during the first half of 2008.

74.     A new Zepol service which provides census data identical to that used by the Trade Commission, except vessel weights are reported identical to the B/L's, can be used to examine this lapse in trade name B/L's.

75.     Exactly the same vessel weights can be found in the B/L's under the general description of "organic pigments" which perfectly match the vessel weights from the census data, proving that "Lionogen" continued to be imported during this period.

76.     The Dataweb and PIERS/Zepol import records show that there were virtually no exports from Toyo in Japan between 2002 and 2005 (**Table II, Part B**, Japan Subtotal).

77.     This was the time period when the JV in Mexico was active. It should be noted, however, that total Japanese and Mexican imports declined steadily from 2000 through the first half of 2004 (**Table II, Part B**). This is because low priced Chinese imports were replacing not only domestic production in the United States, but imports from Japan and Mexico as well.

78.     These dynamics changed completely in June 2004, when preliminary antidumping duties were placed on CVP-23 imports from China and India. This breathed new life into the JV and resulted in large increases in CVP-23 exports to the United States beginning in the second half of 2004 and continuing through 2005.

79.     The JV apparently ceased operating sometime in 2005, and imports from Japan began again in 2006. The most likely cause for this transition was that production in Mexico was much more expensive than in Japan, where Toyo Ink began sourcing its entire requirement of Crude Violet from nearby China.

80. The export price from Mexico of $39.72/kg in 2005 fell to $20.45/kg in 2006 (**Table II, Part C**, highlighted cells) when exports from Japan resumed. Armed with the low-priced Crude Violet and free of Pyosa, Toyo aggressively cut the price almost in half to regain and increase market share in the United States.

81. Upon information and belief, the last CVP-23 shipped by Sumitomo was in June 2006. From that time forward, Japan has been totally dependent upon Crude Violet from China, and possibly small amounts from India.

82. Nation Ford and Sun have made no shipments of Crude Violet to Japan.

83. Clariant (Germany) similarly reports that it has never shipped more than one metric ton per year of Crude Violet to Japan.

84. As previously discussed, there are no other Crude Violet producers in the world except in China and India. As will be discussed later, the JV already had begun sourcing from China. It was natural for Toyo Ink in Japan to continue importing Crude Violet from China, especially since there was no further production of Crude Violet available from Sumitomo.

**Substantial Transformation**

85. The U.S. Rules of Origin are explained in the <u>CBP Informed Compliance Publication of May 2004</u>. Quoting from page 8 of this publication under Non-Preferential Rules of origin:

> All U.S. non-preferential rules of origin schemes employ the "wholly obtained" criterion for goods that are wholly the growth, product, or manufacture of a particular country. On the other hand, all U.S. non-preferential rules of origin schemes employ the "substantial transformation" criterion for goods that consist in whole or in part of materials from more than one country. In the majority of the non-preferential schemes, the substantial transformation criterion is applied on a case-by-case basis, and it is based on a change in name/character/use method (*i.e.*, an article that consists in whole or in part from more than one country is a product of the country in which it has been substantially transformed into a new and different article of commerce with a name,

character, and use distinct from that of the article or articles from which it was so transformed).

86.   The process of converting Crude Violet into Finished Violet does not pass any of the tests for substantial transformation.  There is no change of name in the conversion of crude to finished pigment.  Both forms of the pigment have the same chemical name, molecular formula, CI Number, and CAS Number.  There is no chemical reaction and no shift in HTSUS classification.

87.   The Customs Department made an important ruling in 2004 that speaks directly to the issue of change in character and use.  This entire ruling is included herewith as **Exhibit 8**. This ruling was considered of sufficient interest to the public and the Custom Department's field offices to merit publication in the Custom Bulletin.  Quoting from page 3 of the Bulletin notice:

> The imported flat flexible magnet material in sheets and rolls are not raw material with a wide variety of uses.  The use of the flat flexible magnet is pre-determined by the character of the imported flat flexible magnet sheeting.  The application of printed advertising material to the surface of the imported magnetic sheeting does not change the character or use of the flat flexible magnetic sheeting.  The imported article already has its final character and is dedicated to its specific use as a magnet at the time of import and the operations performed in the United States are merely finishing operations which do not confer origin.

88.   Now consider this same language for the case of producing Finished Violet in countries different from where the Crude Violet was made:

> The [imported Crude Violet from China] is not raw material with a wide variety of uses.  The use of [Finished Violet] is pre-determined by the character of the imported [Crude Violet].  The [processing of Crude Violet into Finished Violet] does not change the character or use of [Crude Violet].  The imported article already has its final character and is dedicated to its specific use as a [colorant] at the time of import and the operations performed in [Mexico and Japan] are merely finishing operations which do not confer origin.

## "Single Domestic Like Product"

89.     In its investigation of CVP-23 originating from China and India, the Trade Commission found a "single domestic like product" comprised of both Crude Violet and Finished Violet, concluding as follows:

> Based on the record as a whole, we find that there is not a sufficiently clear dividing line between crude and finished violet 23 to warrant finding two separate like products. Crude violet 23 has no use other than to be converted into finished violet 23. As explained above, there are no independent uses or markets for the crude violet 23 supplied by NFC other than for use in the production of finished violet 23. Moreover, although NFC is the only producer of the crude violet 23 and does not produce finished violet 23, Sun supplies the raw materials for the production of crude violet 23 to NFC and has also provided financing and technical help. NFC then produces the crude violet 23 under a tolling arrangement with Sun. Crude and finished violet 23 have the same chemical structure, and crude violet 23 imparts to finished violet 23 essential coloring properties, although a conversion process is necessary to make the product useable. Crude violet 23 involves a chemical synthesis, while finished violet 23 production does not. Although the costs associated with and the processes used to produce finished violet 23 are not insignificant, crude violet 23 is the most costly input used to make finished violet 23. On balance, we find a single domestic like product, violet 23, whether in crude or finished form, that is coextensive with the scope of these investigations.[17]

90.     The finding of a "single domestic like product" means that all forms of CVP-23 included in the scope of the investigation are treated the same with respect to the antidumping and countervailing duty orders, as if they were exactly the same product. Thus, there is no change in like product when Crude Violet is imported into Mexico and Japan, and Finished Violet 23 is then exported from there to the United States.

## Defendants' False Records and Statements

91.     The PIERS and Zepol B/L's for Toyo's imports of CVP-23 provide a chronology of Defendants' false records and statements. See **Exhibit 6**.

---

[17] CVP-23 Investigative Report, USITC Pub. 3744 at 7.

92.     Each B/L shows the date that Defendants imported a shipment of CVP-23 into the United States ("Arrival Date").

93.     Defendants engaged brokers to coordinate each of these shipments.

94.     On or about each Arrival Date, Defendants provided the country-of-origin information to their brokers.  On or about each Arrival Date, Defendants' brokers used the country-of-origin information provided by Defendants to complete and submit the required Customs Department forms.

95.     B/L information is only available for sea shipments; therefore, Defendants' land shipment information from Mexico to the United States is not available through B/L's. However, the Trade Commission's Dataweb website can provide monthly census data for the amount of CVP-23 imported into the United States; this data is attached as **Table V** and is incorporated herein by reference.

96.     As stated above, since Sun and Toyo are the only significant importers of CVP-23, Toyo's imports can be calculated by using Dataweb's census data and subtracting Sun's imports through Cleveland, Chicago, and Charleston for the applicable time periods Sun imported through these ports.

97.     Toyo is the only importer bringing in CVP-23 from Mexico; therefore, in or about every month a shipment arrived in Laredo, Texas (as shown in **Table V**), Defendants provided the false country-of-origin information to its brokers.  In or about each month, Defendants' brokers used the country-of-origin information provided by Defendants to complete and submit the required Customs Department forms.

98.     Defendants knew that their brokers would use Defendants' country-of-origin information to complete CBP Form 7501, which is required for all imports into the United States intended for domestic consumption.

99.     Defendants also knew that their brokers would use Defendants' country-of-origin information to complete NAFTA Certificate of Origin documentation, CBP Form 434, which is required for any goods for which an importer is claiming a NAFTA-member preferred duty rate.

100.     Furthermore, prior to each Arrival Date, Defendants falsely marked the packaging material as if the CVP-23 was made in Japan or Mexico, rather than China.

101.     By providing the false country-of-origin information and by falsely marking the packaging material, Defendants made or caused to be made a false record or statement material to their obligation to pay money to the United States.

### Lost MFN Duties From Mexican Imports

102.     **Table III** included herewith documents lost MFN duties resulting from wrongful claims of NAFTA origin for imports of Finished Violet made under HTSUS subheading 3204.17.9040 by Toyo America from the JV in Mexico.  The data for Custom Value, Export Quantity, and Export Duties Paid were downloaded directly from the Dataweb.

103.     NAFTA duty free eligibility was claimed for all imports from 2001 through 2004 (except for $472 paid in 2004).

104.     Partial eligibility was claimed for 2005 and 2006, but not for 2008 and 2009.

105.     Duty free treatment was claimed for 81.4% of all exports to the United States.

106.     The corresponding imports of Crude Violet are documented by B/L's obtained from Zepol shown in **Exhibit 9**.  Zepol data include all shipments entering the United States, whether intended for import or transshipment to other countries.  Because many Mexican

imports often come through United States ports, such data gives a good picture of many Mexican imports.

107.    The imports from Japan are identified as "Sumitone Fast Violet RL," the Sumitomo trade name for Crude Violet. They were consigned to "Toyo Color America", entering the country in Los Angeles and Long Beach for truck transportation to Monterey. The imports from China are identified as "Pigment Violet RL Crude" and were also consigned to "Toyo Color America" with Pyosa as one of parties to notify.

108.    PIERS offers Mexican Customs data for specified periods by name of importer.

109.    A search for all imports by Pyosa for January 2004 through April 2005 matched perfectly with the Zepol B/L's for the same period.

110.    There were two imports from China in early 2005 that were not part of the Zepol B/L's because they arrived in Mexico by steamship. **Table IV** provides the Mexican import data for Crude Violet. By this record, there was 110,400 kg imported, of which 80.4% entered Mexico through the United States, surprisingly close to the 81.4% total duty free imports shown in **Table III**. It is entirely possible that the JV used transport through the United States to justify duty free treatment on the corresponding exports back to the United States.

111.    In sum, the JV saved $302,931 by wrongfully claiming duty free treatment on its exports of CVP-23 to the United States.

**Lost Antidumping Duties On Chinese CVP-23 Imported From Mexico & Japan**

112.    Because Crude Violet is not produced in Mexico, the JV relied upon imports of Crude Violet from Japan and China.

113.    From 2001 through 2003, Sumitomo was the most likely supplier, but beginning in 2004, the JV sourced from Sumitomo and China.

114.    Antidumping duties apply to those Mexican exports of Finished Violet created from Chinese Crude Violet, but such duties do not apply to Mexican exports of Finished Violet created from Crude Violet supplied by Sumitomo.

115.    **Table IV** shows that the JV sourced 45.7% of its Crude Violet from China.

116.    **Table II, Part A, Row 22** estimates the lost antidumping duties by year for Finished Violet imports made from Crude Violet produced in China.

117.    The magnitude of these uncollected duties, totaling $28.3 million, would have prevented these imports from occurring, thus providing the protection intended for the domestic CVP-23 industry.

118.    As it is, the domestic industry lost these sales and continued to experience material injury.

**Penalties**

119.    The Code of Federal Regulation, Ch. 1 (4-1-09 Edition), App. B to Part 171, provides for penalties up to the domestic value of the merchandise for the failure to properly declare and pay the required customs duties.

120.    In this case, penalties apply for failure to pay MFN duties and antidumping duties, totaling $15.6 million. See **Table II, Part A, Row 23**.

121.    Toyo also is liable for additional duties of 10% of the appraised value of the CVP-23 for failure to mark the good as made in China in accordance with 19 C.F.R. Ch. 1, Subpart B – Rules of Origin, § 134.2. These penalties total $1.56 million. See **Table II, Part A, Row 24**.

**Continued Dumping & Subsidy Offset Act ("CDSOA")**

122.    Antidumping duties collected for imports into the United States occurring from October 1, 2000, through September 30, 2007, are subject to the CDSOA, often referred to as the "Byrd Amendment."

123.    The CDSOA requires that dumping duties for imports arriving in the United during this period be distributed to the domestic industry.

124.    **Table II, Part A, Row 28** shows this amount to be $11.5 million.

**FIRST CAUSE OF ACTION**
**[Violation of the False Claims Act –**
**31 U.S.C. § 3729(a)(1)(G) (formerly 31 U.S.C. § 3729(a)(7))]**

125.    The preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

126.    Relator, as the original source of information regarding Defendants' violations of the False Claim Act, has direct and independent knowledge of the information on which the allegations contained herein are based.

127.    As discussed above, China is the proper country of origin for Crude Violet produced in that country – that is merely finished in another country – before importation into the United States.

128.    On or about the Arrival Date of each shipment of CVP-23 imported into the United States, Defendants fraudulently instructed their brokers to claim that the CVP-23 had a country-of-origin of Japan or Mexico, rather than China.

129.    Furthermore, prior to the Arrival Date of each shipment of CVP-23 originating from China imported into the United States, Defendants fraudulently marked the packaging as made in Japan and Mexico, rather than China.

130.    At all times material to this Complaint, Defendants either had actual knowledge of the falsity, acted in deliberate ignorance of the truth or falsity, or acted in reckless disregard of the truth or falsity of their records and statements regarding the proper country of origin for Chinese CVP-23 they imported into the United States.

131. By falsely declaring Mexico or Japan as the country-of-origin on the CBP Forms 7501, Defendants avoided paying an antidumping duty of 241.32% required for imports of CVP-23 from China.

132. By falsely declaring Mexico as the country of origin on CBP Forms 434, Defendants also avoided paying the MFN duty rate of 6.5% required for imports of CVP-23 from China, in addition to the 241.32% antidumping duty.

133. Defendants further owe penalties up to the domestic value of the goods in accordance with 171 C.F.R. Ch. 1, App. B, for falsely declaring Mexico or Japan as the country-of-origin for imports of CVP-23 from China.

134. Defendants are also liable for additional duties of 10% of the appraised value of the goods in accordance with 19 C.F.R. Ch. 1, Subpart B, for falsely marking the CVP-23 packaging as being made in Japan and Mexico, rather than China.

135. Defendants had obligations to represent the proper country of origin on the customs forms, to pay the required antidumping and MFN duties, and to properly mark the packaging with the actual country of origin, as these obligations were established duties arising from statutes and regulations.

136. Defendants' aforementioned false country-of-origin designations had a natural tendency to influence the Customs Department to assess Defendants a lower (or no) duty to import the CVP-23 – which actually originated from China – into the United States.

137. By falsely declaring Mexico or Japan as the country of origin for CVP-23 originating from China, Defendants made or caused to be made a false record or statement material to their obligation to pay money to the United States.

138.    Furthermore, by falsely declaring Mexico or Japan as the country-of-origin for the CVP-23, Defendants have knowingly concealed and knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the United States.

139.    Defendants' false records or statements, concealment, and avoidance violate 31 U.S.C. § 3729.  Through their violations of 31 U.S.C. § 3729, Defendants have obtained entry and release of their CVP-23 into the United States without paying amounts due to the United States.  Defendants have knowingly or recklessly damaged the United States in an amount to be determined at trial, but believed to exceed $45 million.

## SECOND CAUSE OF ACTION
### [Conspiracy to Violate the False Claims Act –
### 31 U.S.C. § 3729(a)(1)(C) (formerly 31 U.S.C. § 3729(a)(3))]

140.    The preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

141.    Defendants acted in concert to violate the False Claims Act by knowingly making, using, or causing to be made or used, a false record or statement material to their obligation to pay money to the United States by falsely declaring Mexico or Japan as the country of origin for the CVP-23 – which originated from China – that they imported into the United States.

142.    Defendants also acted in concert to violate the False Claims Act by knowingly concealing or knowingly and improperly avoiding or decreasing their obligation to pay or transmit money or property to the United States by failing to properly declare China as the country-of-origin for the CVP-23 they imported into the United States.

143.    Defendants committed the overt acts described above in furtherance of the conspiracy, including but not limited to, stating a false country-of-origin on required customs

forms, concealing and avoiding their obligation to pay antidumping and MFN duties, and fraudulently marking the CVP-23 packaging with a false country-of-origin.

144. Defendants' conspiracy violates 31 U.S.C. § 3729(a)(1)(C), by which Defendants obtained entry and release of their CVP-23 into the United States without paying amounts due to the United States. Defendants have knowingly or recklessly damaged the United States in an amount to be determined at trial, but believed to exceed $45 million.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff United States *ex rel.* John Dickson prays for the following:

1. An award of treble damages, civil penalties, expenses, fees, and costs against Defendants, jointly and severally, in accordance with 31 U.S.C. § 3729 *et seq.* for Defendants' violations of 31 U.S.C. § 3729(a)(1)(G) (and/or the preceding version of such statutory section, 31 U.S.C. § 3729(a)(7));

2. An award of treble damages, civil penalties, expenses, fees, and costs against Defendants, jointly and severally, in accordance with 31 U.S.C. § 3729 *et seq.* for Defendants' conspiracy and violation of 31 U.S.C. § 3729(a)(1)(C) (and/or the preceding version of such statutory section, 31 U.S.C. § 3729(a)(3));

3. An award of a trial by jury on all issues so triable; and

4. An award of such other and further relief, legal or equitable, which the Court deems just and proper.

*[Signature Page Follows]*

This the 9th day of October, 2009.

JAMES, McELROY & DIEHL, PA.

J. Mitchell Aberman, NC Bar No. 12295
Preston O. Odom, III, NC Bar No. 29587
Justin D. Bice, NC Bar No. 38033
600 South College Street, Suite 3000
Charlotte, North Carolina 28202
704-372-9870 (telephone)
704-333-5508 (facsimile)
MAberman@jmdlaw.com, POdom@jmdlaw.com;
JBice@jmdlaw.com
*Attorneys for John Dickson*

## CERTIFICATE OF SERVICE

I hereby certify that this **COMPLAINT: FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** has been served via certified mail, return receipt requested, sufficient postage prepaid, addressed as follows:

Donald H. Caldwell, Jr., Esq.                Attorney General of the United States
Assistant United States Attorney             c/o Daniel R. Anderson, Esq.
United States Department of Justice          United States Department of Justice
Western District of North Carolina           Civil Division, Fraud Section
227 West Trade Street, Suite 1650            Patrick Henry Building
Charlotte, North Carolina 28202-1675         601 D Street
                                             Washington, DC 20530

This the 9th day of October, 2009.

**JAMES, McELROY & DIEHL, PA.**

J. Mitchell Aberman, NC Bar No. 12295
Preston O. Odom, III, NC Bar No. 29587
Justin D. Bice, NC Bar No. 38033
600 South College Street, Suite 3000
Charlotte, North Carolina 28202
704-372-9870 (telephone)
704-333-5508 (facsimile)
MAberman@jmdlaw.com, POdom@jmdlaw.com;
JBice@jmdlaw.com
*Attorneys for John Dickson*